UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
LAFAYETTE DIVISION

STEPHEN FRANCIS MUNSEY,       )
                             )
      Plaintiff,            )
                             )
      v.                  )     CAUSE NO.: 4:17-CV-30-TLS
                             )
NANCY A. BERRYHILL,         )
ACTING COMMISSIONER OF THE   )
SOCIAL SECURITY           )
ADMINISTRATION,          )
                             )
      Defendant.        )

**OPINION AND ORDER**

The Plaintiff, Stephen Francis Munsey, seeks review of the final decision of the Commissioner of the Social Security Administration denying his application for Disability Insurance Benefits and Supplemental Security Income. The Plaintiff argues that the Commissioner erred by: (1) failing to properly evaluate the opinion of the Plaintiff's treating physician; and (2) failing to properly include the use of a cane in the residual functional capacity determination. For the reasons set forth below, the Court REVERSES and REMANDS this case for further proceedings in accordance with this Opinion and Order.

**BACKGROUND**

In September 2013, the Plaintiff filed an application for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. § 423(d), as well as an application for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. § 1382c(a)(3), alleging disability beginning January 31, 2001. (R. 179–91.) His claims were denied initially on December 13, 2013, and upon reconsideration on April 3, 2014. (R. 51–101.) An

administrative law judge (ALJ) conducted a video hearing on September 1, 2015, during which the Plaintiff—who was represented by an attorney—and a vocational expert (VE) testified. (R. 25–50.) On March 2, 2016, the ALJ denied the Plaintiff's application, finding that he was not entitled to benefits. (R. 11–19.) On February 9, 2017, the ALJ's decision became the final decision of the Commissioner when the Appeals Council denied the Plaintiff's request for review. (R. 1–6.) The Plaintiff filed this claim in federal court against the Acting Commissioner of the Social Security Administration on April 14, 2017 [ECF No. 1].

## THE ALJ'S FINDINGS

Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, a claimant must demonstrate that his physical or mental limitations prevent him from doing not only his previous work, but also any other kind of gainful employment that exists in the national economy, considering his age, education, and work experience. §§ 423(d)(2)(A), 1382c(a)(3)(B).

An ALJ conducts a five-step inquiry in deciding whether to grant or deny benefits. 20 C.F.R. §§ 404.1520, 416.920. The first step is to determine whether the claimant no longer engages in substantial gainful activity (SGA). *Id.* In the case at hand, the ALJ found that the Plaintiff had not engaged in SGA since his alleged onset date, January 31, 2001. (R. 13.)

At step two, the ALJ determines whether the claimant has a severe impairment or combination of impairments that limit his ability to do basic work activities under §§ 404.1520(c) and 416.920(c). With regard to the instant Title II claim, the ALJ determined that

2

the Plaintiff was insured for purposes of benefits through September 30, 2006, but found that the

Plaintiff did not meet the requirements of Title II disability because the record lacked "any

treatment, diagnosis, or evidence of any impairments prior to the claimant's date last insured . . .

." (R. 13.) Thus, the Plaintiff's Title II claim was denied at step 2, and the remainder of the

ALJ's decision focused solely on the Plaintiff's Title XVI claim. (R. 13–14.)[1] The ALJ

determined that the Plaintiff had severe impairments of degenerative disc disease, anxiety, and

obesity. (R. 14.) However, the ALJ found that the Plaintiff's diabetes was non-severe. (*Id.*)

Step three requires the ALJ to "consider the medical severity of [the] impairment" to

determine whether the impairment "meets or equals one of [the] listings in appendix 1 . . . ."

§§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment(s), considered singly or in

combination with other impairments, rise to this level, there is a presumption of disability

"without considering [the claimant's] age, education, and work experience." §§ 404.1520(d),

416.920(d). But, if the impairment(s), either singly or in combination, fall short, the ALJ must

proceed to step four and examine the claimant's "residual functional capacity" (RFC)—the types

of things he can still do physically, despite his limitations—to determine whether he can perform

"past relevant work," §§ 404.1520(a)(4)(iv), 416.920(A)(4)(iv), or whether the claimant can

"make an adjustment to other work" given the claimant's "age, education, and work experience,"

§§ 404.1520(a)(4)(v), 416.920(a)(4)(v). Here, the ALJ determined that the Plaintiff's

impairments did not meet or equal any of the listings in Appendix 1 and that he had the RFC to

perform light work, as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), but modified as

follows:

---

[1] As pointed out by the Government, the Plaintiff does not challenge this finding, nor does he point to any treatment, diagnoses, or evidence of any impairments prior to September 30, 2006. Arguments challenging the Title II finding are deemed waived. *See Sneed v. Colvin*, No. 1:13-CV-00300, 2014 WL 7358282, at *1 (N.D. Ind. Dec. 23, 2014).

> [T]he claimant lifts or carries 20 pounds occasionally and 10 pounds frequently, stands or walks for six of eight hours during the workday, and sits for six of eight hours during the workday. The claimant can occasionally climb, balance, stoop, kneel, crouch, and crawl. The claimant can frequently reach overhead bilaterally. The claimant must avoid a concentrated exposure to extreme cold, wetness, and vibration. The claimant can have no exposure to slippery, uneven surfaces. The claimant can perform simple to mildly complex work with brief, superficial interactions with others.

(R. 15.)

In doing so, the ALJ evaluated the objective medical evidence and the Plaintiff's subjective symptoms and found that the Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms but that his statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely credible to the extent they were inconsistent with the aforementioned RFC assessment. (R. 18.) For example, the ALJ described the Plaintiff as having "good functioning despite the claimant's abnormalities." (R. 16.) He noted lumbar and thoracic x-rays showing moderate degenerative changes in January 2013, a spine scan showing "grade I anterolisthesis of L5 on S1, and severe bilateral foraminal stenosis at the L5-S1 disc" in February 2013, and an MRI showing "grade I spondylosis, mild L5-S1 stenosis, and possible nerve root compression" in April 2013; yet, despite these results and the fact that the Plaintiff had a "positive straight leg raise test," the ALJ pointed out that he had "full strength, and a normal gait without an assistive device" during a consultative examination in December 2013. (*Id.*) The ALJ found the Plaintiff's hearing testimony—that he could only stand for fifteen minutes at a time, sit for ten minutes at a time, and walk one-hundred-fifty feet with a cane—to be contradicted by the related medical evidence from that consultative examination where he "walked unassisted and normally." (R. 16–17.) The ALJ also referenced cervical x-rays in December 2014 that showed "moderate C5-C6 degenerative changes," a lumbar MRI from January 2015 that he described as "unchanged," and

a cervical MRI from July 2015 that he described as "overall unchanged." (R. 16.) The ALJ

concluded that the Plaintiff's lumbar and cervical imaging "did not show significant worsening."

(R. 17.) Finally, the ALJ determined that the Plaintiff is "able to perform activities of daily

living" because he can drive, shop by computer, pay bills, "mow the yard in small spurts," and

"complete small household repairs." (*Id.*)

      With regard to the opinion evidence, the ALJ afforded the opinions of the state agency

medical consultants—who opined that the Plaintiff was capable of performing light work in

accordance with the above RFC determination—"great weight" because their opinions were

"consistent with the claimant's normal functioning during his consultative examination" and

because they were "supported by spinal imaging that did not show worsening." (*Id.*)  As to the

Plaintiff's treating physician, Scott Carrington, M.D. (Dr. Carrington), the ALJ stated in full:

> [Dr. Carrington] found that the claimant could lift 10 pounds, stand or walk 30
> minutes at a time, stand or walk only two hours total during the day, sit only two
> hours, could rarely stoop, will have pain that interferes with attention and
> concentration, and will likely miss more than four days of work per month (Exhibit
> 15F/1). However, his opinion is contradicted by evidence that the claimant has full
> strength and walks normally (Exhibit 13F). His opinion is contradicted by spinal
> imaging that did not show worsening (exhibit 18F). Therefore, his opinion is
> granted little weight.

(*Id.*)

      At step four, the ALJ must determine whether the claimant has the RFC to perform his

past relevant work. §§ 404.1520(f), 416.920(f). In this case, the Plaintiff has past relevant work

as a material handler and mechanic, which the ALJ found he was not able to perform. (R. 18.)

      Finally, at the last step of the sequential analysis, the ALJ must determine whether the

claimant is able to make an adjustment to any other work. §§ 404.1520(g), 416.920(g). Relying

on the VE's testimony, the ALJ concluded that "[c]onsidering the claimant's age, education,

work experience, and residual functional capacity, the claimant is capable of making a successful

adjustment to other work that exists in significant numbers in the national economy." (*Id*.) Thus, the ALJ found that the Plaintiff was not disabled as defined in the Social Security Act from January 31, 2001, through the date the decision was issued on March 2, 2016. (R. 19.)

## STANDARD OF REVIEW

The decision of the ALJ is the final decision of the Commissioner when the Appeals Council denies a request for review. *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). The Social Security Act establishes that the Commissioner's findings as to any fact are conclusive if supported by substantial evidence. *See Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995). Thus, the Court will affirm the Commissioner's finding of fact and denial of disability benefits if substantial evidence supports them. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2009). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

It is the duty of the ALJ to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Richardson*, 402 U.S. at 399– 400. The reviewing court reviews the entire record; however it does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *See Diaz*, 55 F.3d at 608. A court will "conduct a critical review of the evidence," considering both the evidence that supports, as well as the evidence that detracts from, the Commissioner's decision, and "the decision cannot stand if it

lacks evidentiary support or an adequate discussion of the issues." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (internal quotations omitted).

When an ALJ recommends the denial of benefits, the ALJ must first "provide a logical bridge between the evidence and [his] conclusions." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (internal quotation marks and citation omitted). Though the ALJ is not required to address every piece of evidence or testimony presented, "as with any well-reasoned decision, the ALJ must rest its denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). However, if substantial evidence supports the ALJ's determination, the decision must be affirmed even if "reasonable minds could differ concerning whether [the claimant] is disabled." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

## ANALYSIS

As noted above, the Plaintiff argues that the Commissioner erred by: (1) failing to properly evaluate the opinion of Dr. Carrington, the Plaintiff's treating physician; and (2) failing to properly determine the Plaintiff's RFC. Specifically, the Plaintiff contends that the ALJ erred by ignoring medical evidence that would have supported a finding of disabled, by using flawed logic to discount Dr. Carrington's opinion, and by failing to consider the checklist of factors when determining that the treating physician's opinion was not entitled to controlling weight. He also argues that the ALJ left out vital information that would have supported the need for a cane as part of the Plaintiff's RFC determination. The Government, on the other hand, contends that the ALJ's analysis of the opinion evidence was adequate because he properly found that Dr. Carrington's opinion was contradicted by other medical evidence and that the Plaintiff's

activities of daily living were inconsistent with his allegations of disabling functional limitations. The Government insists that the ALJ's failure to address the factors related to the weighing of Dr. Carrington's opinion was a harmless error because the Plaintiff "has not demonstrated that the ALJ's failure to explicitly discuss each factor in his analysis would have changed the outcome of this case." [ECF No. 15, p. 10.] The Government also argues that there was not sufficient evidence to show the cane was medically necessary, so the ALJ did not err in failing to include a limitation for its use in his RFC.

### A.      The ALJ's Evaluation of Opinion Evidence

An ALJ is tasked with evaluating the opinion evidence in the record when making a determination of disability. In doing so, unless a treating source's opinion is given "controlling weight," the ALJ considers several factors to determine the appropriate weight given to any medical opinion: (1) the examining relationship; (2) the treatment relationship; (3) the supportability of the opinion including relevant evidence and explanations; (4) the consistency of the opinion as viewed in light of the record; (5) whether the opinion is given by a specialist on issues related to his or her area of expertise; and (5) any other factors which tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c), 416.927(c). Generally, more weight is given to a treating physician's opinion because of his greater familiarity with the claimant's conditions and circumstances." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (citing *Whitney v. Schweiker*, 695 F.2d 784, 789 (7th Cir. 1982)). In fact, a treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." §§ 404.1527(c)(2), 416.927(c)(2). When a treating physician's opinion is not given controlling

8

weight, in addition to the factors listed above, the ALJ must also consider the length of the treatment relationship and the frequency of examination plus the nature and extent of the treatment relationship to determine what weight to give the opinion. *Id*. An ALJ may discount a treating source's medical opinion if it is internally inconsistent or inconsistent with other evidence in the record. *Clifford*, 227 F.3d at 871. An ALJ may likewise discount a treating physician's opinion if it reveals bias due to sympathy for the patient. *See Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001).

It is not the reviewing court's job to determine whether the treating physician's opinion should have been given controlling weight. *See Clifford*, 227 F.3d at 869 ("[W]e review the entire record, but do not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner."). Ultimately, however, the ALJ must give "good reasons" to support the weight he assigns to the treating source's opinion. §§ 404.1527(c)(2), 416.927(c)(2); *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010). "The ALJ must give substantial weight to the medical evidence and opinions submitted, unless specific, legitimate reasons constituting good cause are shown for rejecting it." *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995) (first citing 20 C.F.R. §§ 404.1527(c)–(d); then citing *Washington v. Shalala*, 37 F.3d 1437, 1440 (10th Cir. 1994); and then citing *Edwards v. Sullivan*, 985 F.2d 334, 337 (7th Cir. 1993)). A court on review must uphold "all but the most patently erroneous reasons for discounting a treating physician's assessment." *Luster v. Astrue*, 358 F. App'x 738, 740 (7th Cir. 2010).

1. *Dr. Carrington's Opinion*

The ALJ assigned Dr. Carrington's opinion little weight, finding that it was contradicted by evidence that the Plaintiff "has full strength and walks normally (Exhibit 13F)" and by "spinal imaging that did not show worsening (Exhibit 18F)." (R. 17.) His determination is devoid of further analysis or explanation. The ALJ cited broadly to the medical records of the Plaintiff's mental health counselor and psychiatrist to support his conclusion that the Plaintiff has full strength and walks normally. (R. 17, citing to Exhibit 13F.) This makes little sense both based on the substance of those records—which do not specifically address strength or ambulation other than to indicate that "back pain" was present—and because there is no indication that the Plaintiff was treating with these medical professionals for spine or pain management issues. (*See* R. 621–40.) That said, the Court agrees with the Government that this was likely a typographical error, as, on the previous page, the ALJ cited to the December 2013 consultative examination performed by Luella Bangura, M.D. (Dr. Bangura) when discussing the Plaintiff's physical impairments and noted that he had "full strength, and a normal gait without an assistive device." (R. 16, citing to Exhibit 11F/5–6.) While the Court acknowledges that a typographical error such as this can be harmless in and of itself, *see, e.g.*, *Morris v. Astrue*, No. 3:12–CV–538–TLS, 2014 WL 1259958, at *5 (N.D. Ind. Mar. 26, 2014), the ALJ's treatment of the opinion evidence overall is another matter entirely. Even assuming that the ALJ intended to cite to Dr. Bangura's consultative examination,[2] his analysis was deficient. As pointed out by the Plaintiff, the ALJ

---

[2] Interestingly, while the ALJ described Dr. Bangura's findings from the consultative examination as having a "positive straight leg raise test, but had full strength, and a normal gait without an assistive device," he did not mention that Dr. Bangura also found the Plaintiff had tenderness of the lumbosacral spine, was unable to walk on his toes or heels, and could only bend over to 75 percent. (R. 16, 618.) Dr. Bangura's impression per the consultative examination was that the Plaintiff had lumbosacral back pain, degenerative disc disease of the lumbosacral area, and neuropathy of the right leg, among other ailments, and an x-ray of the lumbosacral area and EMG study of the right leg were recommended. (R. 618.) Dr. Bangura did not address the issue of assigning any specific limitations to the Plaintiff. (*Id.*) Several

ignored or glossed over large swaths of evidence that would tend to support Dr. Carrington's opinion and failed to articulate "good reasons" for discounting it. *See e.g.*, *Scott v. Astrue*, 647 F.3d 734, 739–41 (7th Cir. 2011) (reasons given by the ALJ for discounting the treating physicians' opinions did not meet the required standard).

For example, in January 2014, shortly after the consultative examination, the Plaintiff began treating at Neurology and Pain Management Lafayette with neurologist Julian Ungar-Sargon, M.D., Ph.D. (Dr. Ungar-Sargon). (R. 689–780.) Upon initial examination, Dr. Ungar-Sargon noted the following with regard to the Plaintiff's spine:

> CERVICAL SPINE: On examination of paravertebral muscles, hypertonicity, spasms and tenderness noted on both sides. Tenderness is noted at the paracervical muscles. . . .
> THORACIC SPINE: On examination of paravertebral muscles, hypertonicity, spasms, tenderness and tight muscle bands noted on both sides. Tenderness is noted at the paracervical muscles and rhomboids.
> LUMBAR SPINE: Ober's (with the patient in the lateral decubitus position and the knee flexed to 90 degrees–slight abduction of the femur with hip extension to it's [sic] limit–with the pelvis stabilized) were positive. (This is a sign of iliotibial tract contracture associated with trochanteric bursitis or snapping hip syndrome.) Pace's sign positive. (Resisted abduction of the femur while seated caused pain in the buttocks.) Internal rotation of the femur resulted in deep buttocks pain. Straight leg raising test is positive on both sides at 60 degrees.

(R. 778.) With regard to the Plaintiff's hips, Dr. Ungar-Sargon noted:

> BOTH: Ober's (with the patient in the lateral decubitus position and the knee flexed to 90 degrees–slight abduction of the femur with hip extension to it's [sic] limit–with the pelvis stabilized) are positive. (This is a sign of iliotibial tract contracture associated with trochanteric bursitis or snapping hip syndrome.) Gaenslen's are positive. Pace's are positive. (Resisted abduction of the femur while seated caused pain in the buttocks.) Thomas tests are positive. FABER tests are positive. Internal

---

months later during an April 2014 visit to the Bangura Medical Clinic, the Plaintiff presented with acute lumbar back pain, and Dr. Bangura noted that the Plaintiff had moderate tenderness of the lumbosacral spine upon inspection. (R. 669.) She indicated that the "patient needs [a] cane," although that notation was listed with information pertaining to the Plaintiff's diabetes. (R. 670.) Regardless, the ALJ did not mention any of this evidence in his decision, which is concerning considering he granted the opinions of the state medical consultants "great weight" based almost entirely on the fact that he found their opinions to be "consistent with the claimant's normal functioning during his consultative examination (Exhibit 11F)." (R. 17.)

rotation of the femurs resulted in deep buttocks pain. Trendelenberg's tests are positive.

(R. 779.) On cerebellar examination, Dr. Ungar-Sargon described the Plaintiff's gait as antalgic. (*Id.*) The Plaintiff was assessed with lumbar disc displacement without myelopathy. (*Id.*) From March 2014 through July 2015, the Plaintiff returned to Neurology and Pain Management Lafayette for follow-up visits with Dr. Ungar-Sargon approximately fourteen times. (*See* R. 689–774.) The Plaintiff's complaints and Dr. Ungar-Sargon's findings upon physical examination were generally consistent and in accordance with the initial January 2014 visit. (*Id.*) Dr. Ungar-Sargon also assessed the Plaintiff with thoracic spondylosis without myelopathy, pain in joint of shoulder, vertiginous syndrome not otherwise specified, migraine with aura, and cervical disc displacement without myelopathy. (*See e.g.*, R. 689, 724, 741, 755, 773.) The ALJ summed up all of the evidence related to Dr. Ungar-Sargon's treatment of the Plaintiff with one single sentence—"In July 2015, the claimant continued with treatment for lumbar pain (Exhibit 17F)." (R. 17.)

This analysis is deficient because Dr. Ungar-Sargon's medical records addressed much more than lumbar pain; cervical and thoracic spine issues, hip problems, an abnormal gait, vertigo, and shoulder pain were all noted by Dr. Ungar-Sargon but ignored by the ALJ. The ALJ did not explain why he disregarded this evidence, which is problematic, especially considering the Plaintiff did not begin treating with Dr. Ungar-Sargon until after Dr. Bangura's examination and the initial assessment by the state agency medical consultant.[3] *See Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) ("Although the ALJ need not discuss every piece of evidence in the record, he must confront the evidence that does not support his conclusion and explain

---

[3] In fact, Dr. Ungar-Sargon's medical records were not received into evidence until after the date of the hearing, so it is undisputed that the state agency medical consultants did not have the opportunity to review this evidence before forming their opinions. (R. 28–29); *see also* [ECF No. 15, pp. 7–8].

why it was rejected.") (citation omitted); *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) ("The ALJ must evaluate the record fairly. Thus, although the ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling.") (citations omitted).

The ALJ also failed to address Dr. Carrington's own treatment records in any meaningful way. In November 2014, the Plaintiff presented to Dr. Carrington who reviewed his previous spinal imaging and noted that the Plaintiff was complaining of numbness on his right side when sitting, pain and numbing of the left buttocks when sitting and shooting pain when laying down, and saddle numbing. (R. 679.) He also noted that the Plaintiff had a cane. (*Id.*) At a December 2014 visit, Dr. Carrington noted pain, tenseness, and limited range of motion in the neck due to a previous fall; he diagnosed the Plaintiff with neck strain and ordered imaging of the cervical spine. (R. 677.) The impression of those x-rays was that the Plaintiff had "[m]oderate degenerative disc disease at C5–C6" with "[n]o fracture or subluxation." (R. 687.) In January 2015, the Plaintiff saw Dr. Carrington again, complaining of bilateral pain in buttocks to ankles and low back pain triggered by sitting more than five to ten minutes at a time; Dr. Carrington described the Plaintiff upon examination as "[u]sing a cane, and shifting weight in his chair a great deal" and being "[m]ildly distressed." (R. 675.) The Plaintiff was diagnosed with lumbar disc disease and radiculopathy of the leg, and Dr. Carrington ordered an MRI of the lumbar spine. (R. 675–76.) The impression of the MRI was that the Plaintiff had:

1. Mild central spinal stenosis at L3–L4 secondary to moderate broad-based annular bulge and mild facet and ligamentum flavum hypertrophy.
2. Marked bilateral neuroforaminal narrowing at L5–S1 secondary to moderate to large broad-based disc bulge/uncovered disc. This is due to grade 1 spondylolisthesis of L5 on S1 and bilateral pars defects.

(R. 683–84.) In July 2015, the Plaintiff returned to Dr. Carrington reporting worsening pain in his neck and back and numbing and tingling in his hands; however, he indicated that he had to "put seeing [a] specialist on the back burner while handling the health of his son." (R. 673.) Dr. Carrington noted that the Plaintiff had a cane for walking and was "[s]ullen, and uncomfortable with shifting weight." (*Id*.) He diagnosed the Plaintiff with lumbar stenosis and advised him to see a specialist but agreed that the Plaintiff had "other reasonable priorities for the time being." (*Id*.) Approximately two weeks later, the Plaintiff saw Dr. Carrington for acute neck and shoulder pain that produced numbness in his right thumb and caused him to "sit in a slouch" to avoid discomfort. (R. 672.) Dr. Carrington's objective findings were that the Plaintiff was "[o]bese, with poor attention to grooming" and was having "[m]ild positional pain distress." (*Id*.) He was diagnosed with cervical neuropathic pain and disc disorder of the cervical region. (*Id*.) A follow-up cervical MRI ordered by Dr. Carrington indicated that "[a]t C5-C6, there is moderate disc ossific complex with superimposed right paracentral disc protrusion which causes concavity of the right ventral cord. No cord edema. Severe right neuroforaminal narrowing and mild to moderate left neuroforaminal narrowing at this level." (R. 681–82.)

The entirety of the ALJ's discussion of Dr. Carrington's treatment records consists of specific citations to the December 2014 cervical x-ray, the January 2015 lumbar MRI, and the July 2015 cervical MRI with a notation that the Plaintiff "reported right leg radicular symptoms (Exhibit 16F/4–5)" and that the 2015 MRIs were "unchanged." (R. 16.) Again, such perfunctory analysis was deficient. *See Indoranto*, 374 F.3d at 474; *Golembiewski*, 322 F.3d at 917; *see also Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) ("An ALJ may not selectively consider medical reports, especially those of treating physicians, but must consider all relevant evidence.

14

It is not enough for the ALJ to address mere portions of a doctor's report.") (citations and internal quotation marks omitted).

In light of the evidence noted above and the ALJ's failure to discuss it, the reasons given by the ALJ for the weight he assigned to Dr. Carrington's opinion are of the utmost importance in determining whether his decision was properly supported. *See Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (a decision supported by substantial evidence is one that includes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion") (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The ALJ did not describe Dr. Carrington's opinion as internally inconsistent; rather, he simply stated it was contradicted by: (1) the fact that the claimant walks normally and has full strength, and (2) the fact that the spinal imaging did not show worsening. Neither reason passes muster. With regard to the first reason given by the ALJ, Dr. Carrington opined that the Plaintiff could stand/walk for thirty minutes at one time for up to two hours total in a workday. (R. 671.) The ALJ determined that the Plaintiff's consultative examination with Dr. Bangura contradicted this finding because he was found to have normal muscle strength and was able to "walk[] normally" without an assistive device during that examination (R. 16–17).[4] He concluded that the Plaintiff was able to stand/walk for six hours in an eight hour workday instead. (R. 15.) The ALJ did not explain why the Plaintiff's ability to walk normally in the context of a consultative examination necessarily contradicts Dr. Carrington's opinion—Dr. Bangura offered no indication of how long she observed the Plaintiff walk, nor how far. In fact, she did not opine as to specific limitations at all.[5] The Seventh Circuit

---

[4] As explained in detail above, when discussing the reasons why he discounted Dr. Carrington's opinion, the ALJ cited to the records of the Plaintiff's mental health counselor and psychiatrist; the Court assumes this was a typographical error and that he meant to cite to Dr. Bangura's consultative examination.

[5] The initial state agency medical consultant did opine as to the Plaintiff's exertional limitations, finding that the Plaintiff could stand/walk for six hours in an eight hour workday; however, in doing so, when

15

addressed a similar situation in *Scott*. There, the claimant was examined by a state agency internist who noted that she walked normally in the office during the consultative examination— without the use of her cane—and had a full range of motion. *Scott*, 647 F.3d at 736. The ALJ relied heavily on that consultative examination when assessing the claimant's physical limitations, and, despite the fact that the medical records were replete with instances where the claimant complained of pain to her other doctors and said the cane was needed for balance, the ALJ determined that the claimant was capable of standing/walking for six hours in a day. *Id*. at 736, 740. The Seventh Circuit found that, although the ALJ *said* her conclusion as to the claimant's ambulatory abilities was based on the consultative examination report, the record belied that statement because the "brief excursion" without her cane during the examination "hardly demonstrates an ability to stand for 6 hours (and neither does [the claimant's] testimony that she could walk 2 blocks.)" *Id*. at 740. The court held that, because the primary piece of evidence on which the ALJ relied did not stand for the proposition for which it was cited, the ALJ had failed to build a logical bridge from the evidence to her conclusions. *Id*. (citing *Terry*, 580 F.3d at 475). The same can be said here. The fact that the Plaintiff "walk[ed] normally" during the consultative examination does not necessarily contradict Dr. Carrington's opinion as the ALJ claimed, and because the ALJ failed to discuss subsequently obtained relevant evidence

---

asked to cite to specific facts regarding how and why the evidence supported his conclusions, the state agency physician essentially copied the findings from Dr. Bangura's examination word for word, placing specific emphasis (capitalization) on the findings of a "NORMAL gait, NORMAL station without a device, NO AD." (R. 57.) He also referenced the lumbar MRI from April 2013, noting—without additional explanation—"lumbar mri Grade 1 spondylosis at L5–S1 with associated disc space narrowing and pars defects of the posterior elements, mild spinal stenosis, significant right neuroforaminal narrowing with probable compression of the proximal right L5 nerve root." (R. 57.) This reliance on the consultative examination was then reiterated by the ALJ when he afforded the state agency medical consultants' opinions "great weight" because "[t]heir opinions are consistent with the claimant's normal functioning during his consultative examination (Exhibit 11F)." (R. 17.) The circular reasoning employed by the ALJ is not sufficient to build a logical bridge between the evidence and the ALJ's conclusions when combined with the errors described throughout this Opinion and Order.

that would have supported more significant limitations—i.e., the records of Dr. Ungar-Sargon which are replete with references to spine and hip pain/tenderness and positive testing upon examination plus an antalgic gait, Dr. Carrington's records of the Plaintiff's repeated complaints of pain and the use of a cane, and even Dr. Bangura's own post-examination notations of moderate lumbosacral spine tenderness and the need for a cane—the Court is unable to trace the ALJ's logic in construing it as such.

The same analysis applies to Dr. Carrington's opinion of the Plaintiff's ability to sit for thirty minutes at a time for up to two hours total in a day. It is unclear why the ALJ believed that opinion was contradicted by Dr. Bangura's report of full strength and normal ambulation. Dr. Bangua said nothing about the Plaintiff's ability to sit,[6] and, even assuming a person has full strength and a normal gait, it does not automatically follow that they will be able to sit uninterrupted and without pain for long periods of time. The record contains multiple references to the Plaintiff's complaints of numbness, pain, and tingling of his buttocks while sitting, and Dr. Carrington specifically noted on more than one occasion that the Plaintiff appeared to shift and was uncomfortable/distressed while seated. Again, the ALJ failed to address any of this information and did not build a logical bridge from the evidence to his decision to construe Dr. Carrington's opinion as contrary to the consultative examination. *See Scott*, 647 F.3d at 740.

Additionally, in a similar vein, the ALJ failed altogether to address Dr. Carrington's opinion that the Plaintiff's physical impairments would likely cause him to be absent from work for more than four days a month. Consistent with Dr. Carrington's opinion, the Plaintiff testified that he did not believe he would feel well enough to maintain a regular and constant schedule.

---

[6] Dr. Bangura noted that the Plaintiff was "able to get on and off the exam table without difficulty" (R. 617), but that is hardly a definitive indication that he was able to sit for long periods of time.

17

(R. 37.) Without additional explanation, it does not logically follow that Dr. Carrington's opinion

on the matter was contradicted by Dr. Bangura's findings pertaining to strength and ambulation.[7]

*See Myles*, 582 F.3d at 678 (finding that the ALJ erred by failing to analyze portions of the

treating physician's report related to the claimant's ability to complete a normal workweek

without interruption).

The ALJ's second stated reason for discounting Dr. Carrington's opinion fares no better.

The ALJ broadly concluded that Dr. Carrington's opinion was "contradicted by spinal imaging

that did not show worsening (Exhibit 18F)." (R. 17.)[8] It is not clear if the ALJ was referring to all

previous lumbar, thoracic, and cervical spinal imaging or just the cervical spinal imaging that

was directly correlated to the July 28, 2015, cervical MRI cited to in Exhibit 18F—namely, the

prior radiographs of the cervical spine from December 2014. (*See* R. 681–82, 687, 782–83.)

Either way, the Court is unable to trace the ALJ's logic. If the ALJ's rationale was intended to

pertain solely to the cervical spinal imaging—which certainly seems possible considering he

specifically cited only to exhibit 18F when providing his reason for discounting Dr. Carrington's

opinion related to spinal imaging—then his analysis was clearly flawed. Both the December

---

[7] Notably, the state agency medical consultant who issued an opinion on the claimant's physical limitations did not address absence due to physical impairments at all. (R. 56–59.)

[8] Exhibit 18F is four pages in length and contains a copy of the results of the July 28, 2015 cervical MRI ordered by Dr. Carrington plus part of his related treatment records (R. 782–84) and a one-page summary of an office visit to Scott A. Shapiro, M.D., FACS (Dr. Shapiro) (R. 781). The Plaintiff was referred to Dr. Shapiro based on the results of that MRI by Dr. Carrington who noted that the study was done for "arm numbing and weakness, with pain. MRI shows definite compression on the cord, and should be referred to neurosurgery." (R. 782.) Dr. Shapiro examined the Plaintiff and concluded that he had "pain with extension and right lateral gaze." (*Id.*) He noted that his cervical MRI showed "degenerative disc disease at C5–6 with some bulge to the right and I could see where it could cause intermittent arm pain." (*Id.*) However, Dr. Shapiro stated he refused to operate unless the Plaintiff could quit smoking because healing would be impossible; he indicated that injections could help with pain but that the Plaintiff had been advised his insurance would not pay for them. (*Id.*) The ALJ summarized this evidence by stating, in full, "A follow-up MRI was unchanged (Exhibit 18F). The claimant could not have surgery until he stopped smoking. (Exhibit 18F)." (R. 17.)

2014 cervical spine scan and the July 2015 cervical MRI showed moderate issues at C5–C6; the earlier scan found "[m]oderate degenerative disc disease at C5–C6" with "[n]o fracture or subluxation" (R. 687), and the later scan found "moderate disc ossific complex with superimposed right paracentral disc protrusion which causes concavity of the right ventral cord" plus "[s]evere right neuroforaminal narrowing and mild to moderate left neuroforaminal narrowing" at C5–C6 (R. 682). It can reasonably be assumed that Dr. Carrington based his opinion, in part, on the December 2014 scan which he believed justified some of the limitations he set forth in his July 2015 medical statement pertaining to the Plaintiff's physical abilities—an "unchanged" MRI result obtained approximately two weeks after Dr. Carrington issued that opinion would seem to be consistent with it by definition, not contrary to it. Moreover, all of the cervical spinal imaging was done *after* Dr. Bangura performed her consultative examination and *after* the state agency consultants assessed the Plaintiff's physical limitations, so any abnormalities noted via cervical imaging were, in essence, new and cannot logically be described as "unchanged" or "not show[ing] worsening" as related to the consultative examination or resultant state agency medical opinions.[9] Thus, even if the ALJ intended to reference all previous results when discounting Dr. Carrington's opinion as allegedly being "contradicted by spinal imaging that did not show worsening," his logic was still flawed.

---

[9] In the paragraph of the decision discussing the Plaintiff's physical impairments, the ALJ cited to Exhibit 8F/11, referring to it as a "February 2013 cervical spine scan." (R. 16.) However, the cited evidence is actually a February 2013 *lumbar* spine scan. (R. 522.) The ALJ does not cite to, nor can the Court find, any other cervical imaging results in the record prior to the December 2014 scan. Regardless, the only spinal imaging the initial state agency consultant referred to in his physical residual functional capacity assessment was an April 2013 lumbar MRI which found grade 1 spondylosis and mild spinal stenosis at L5–S1. (R. 57, 329.)

With regard to the lumbar and thoracic spinal imaging in particular, moderate degenerative changes were noted as early as January 2013. (R. 478–79.) The findings from the April 2013 MRI of the lumbar spine revealed:

> Grade 1 spondylosis at L5–S1 with associated disc space narrowing and pars defects of the posterior elements. There is mild spinal stenosis at this level with bilateral facet degenerative hypertrophy. There is significant right neuroforaminal narrowing with probable compression of the proximal right L5 nerve root.

(R. 329.)[10] In addition to grade 1 spondylolisthesis at L5–S1, the impression of a subsequent MRI of the lumbar spine ordered by Dr. Carrington and performed in January 2015 also described "[m]ild central spinal stenosis at L3–L4 secondary to moderate broad-based annular bulge and mild facet and ligamentum flavum hypertrophy." (R. 683–84.) Without additional explanation, it is unclear why the ALJ found these later results contrary to Dr. Carrington's opinion, especially in light of the medical evidence described above that the ALJ failed to discuss. Perhaps the ALJ meant that *none* of the spinal imaging established disabling functional limitations so Dr. Carrington's opinion was inconsistent with the results overall, but that is not what he said—the ALJ specifically stated that Dr. Carrington's opinion was contradicted by results that did not show worsening. However, as pointed out by the Plaintiff, and not disputed by the Government, there is no relevant SSA regulation that suggests objective testing must show a "worsening" of the claimant's condition over time to prove disability. Therefore, this reason given by the ALJ for discounting the treating physician's opinion also fails to meet the required standard. *See Scott*, 647 F.3d at 739–40.

Finally, the Plaintiff argues that the ALJ erred by not properly considering the factors set forth in 20 C.F.R. §§ 404.1527(c), 416.927(c). The Government responds by contending that the

---

[10] As noted in footnote nine, this was the only spinal imaging result cited by the initial state agency medical consultant to support his opinion regarding the Plaintiff's physical limitations. (R. 57.)

ALJ's failure to discuss each factor in detail was harmless error that does not require remand because the outcome of the case would not be changed with proper articulation. The Court cannot agree that the error was harmless. Other than a general citation to the regulations, the ALJ did not even touch on the length, frequency of examination, nature, or extent of Dr. Carrington's treating relationship with the Plaintiff. The Plaintiff visited Dr. Carrington multiple times over the course of approximately nine months for a variety of complaints related to his spinal issues; Dr. Carrington examined the Plaintiff, recorded detailed observations of his condition, ordered additional testing, and ultimately referred him for neurosurgery. The lack of analysis related to these factors coupled with the deficiencies outlined above—especially the failure to discuss the records of Dr. Ungar-Sargon, a treating neurologist who examined the Plaintiff over a dozen times and documented consistent and recurring spinal pain and abnormalities—requires remand because the Court cannot assess whether the ALJ's decision to afford Dr. Carrington's opinion "little weight" was appropriate and supported by substantial evidence. *See Scrogham v. Colvin*, 765 F.3d 685, 697 (7th Cir. 2014) ("Even when an ALJ decides not to give controlling weight to a treating physician's opinion, the ALJ is not permitted simply to discard it. Rather, the ALJ is required by regulation to consider certain factors in order to decide how much weight to give the opinion."); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) ("An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice.").

In sum, the Court finds that the ALJ failed to adequately analyze relevant evidence in the record and articulate good reasons for crediting the state agency medical consultants' opinions with great weight while affording Dr. Carrington's opinion little weight, making it impossible to trace his logic in doing so. Because the ALJ did not build an accurate and logical bridge from the

evidence to his conclusions, remand is required on this issue, and the Court need not address the remainder of the parties' arguments. *See Moss v. Astrue,* 555 F.3d 556, 561 (7th Cir. 2009) (explaining that an ALJ's decision to accept one physician's opinion over another's without proper consideration of the regulatory factors is sufficient reason for reversal); *see also Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) (a decision cannot stand if it "lacks evidentiary support or an adequate discussion of the issues" and an ALJ must "explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review") (citations omitted).[11]

## CONCLUSION

For the reasons stated above, the Court REVERSES and REMANDS this case for further proceedings in accordance with this Opinion and Order.

SO ORDERED on November 9, 2018.

 s/ Theresa L. Springmann
CHIEF JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT

---

[11] On remand, the ALJ is directed to take a fresh look at the evidence. In addition to the issues addressed in this Opinion and Order, the ALJ should also review the evidence and documentation related to the Plaintiff's need for/use of a cane and whether the RFC should include relevant limitations. *See, e.g.*, *Thomas v. Colvin*, No. 12–3354, 534 Fed. Appx. 546, 550 (7th Cir. 2013) (remand required because the ALJ ignored "virtually all" the evidence that would have supported the use of a cane). Here, the ALJ dismissed the issue of an assistive device based solely on the fact that the Plaintiff did not use one during the consultative examination. However, for the reasons noted above, the ALJ's treatment of that fact was problematic.